IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
ALABAMA

NORTHERN DIVISION

RECEIVED

2025 FEB -4 P 12: 02

TROY GRANGER, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

2:25-cv-00089-ECM-JTA

S. M, individually
and R. J., individually
      Plaintiffs

v.

REACH, Inc. an Alabama Domestic Non-profit corporation
THE DYNASTY GROUP, INC, an Alabama domestic corporation
ALABAMA-MISSISSIPPI FARM, INC., an Alabama domestic corporation
BISHOP LUKE EDWARDS, individually and doing business as The Holyland,
DOES 1-5 – those businesses or other entities
that are funded, operated or controlled by or through
the other named Defendants, and
DOES 5-10 – those businesses or other entities that participated
and/or benefited by and through the enterprise operated by the
other Defendants
      Defendants.

_____/

## COMPLAINT

COMES the Plaintiffs. S. M., individually, and R. J., individually, by and through
the undersigned counsel and state:

## INTRODUCTION

1.     Poverty and racism. remain a generational curse for families dependent
upon welfare and/or charities in the rural South, well after the passage of the Civil Rights
Acts and Voting Rights Acts in the mid-1960's.

2.      In 1977, through his church, The Greater Christ Temple in Meridian Mississippi, "Bishop" Luke Edwards created the "Holyland" and formed Reach, Inc., as a not-for profit IRS Section 501 (C)(3) corporation.

3.      He began by opening a grocery store in the basement of the church and began selling groceries to church members for food stamps. Eventually, the profits from the grocery store enabled him to buy an actual grocery store.

4.      Reach, Inc., the business entity created by Edwards, continued to grow and eventually acquired several restaurants, motels, two meat packing plants, a construction company, livestock, and thousands of acres of real estate and farmland. There have been published estimates that Reach, Inc. had a net worth of over twenty million dollars. As will be described in more detail herein, this enormous growth and prosperity was created by and through the unpaid and illegal forced labor of minor children including the Plaintiffs.

5.      Bishop Edwards and Reach, Inc created a communal compound in Emelle, Alabama called "The Holyland". Members of the church lived there in communal housing. They operated in a fashion similar to the Kibbutz in Isreal, with several important distinctions. One obvious distinction is that walls and fences on a Kibbutz are to keep enemies out. At "The Holyland" the walls and fences are to keep people in. It is these distinctions that cross the boundary from acceptable conduct to the violations of human trafficking laws that give rise to this lawsuit.

6.      As noted in an article published by NPR on October 12, 2023, written by Becky Sullivan, Israel's Kibbutz culture has its roots in socialist and Marxist ideas. Like the Holyland created by Bishop Edwards, there was no private property, they had their meals together, and in many cases they raised their children communally. It was a form of voluntary socialism. and afforded members of the kibbutz (often positioned near enemy borders) an extended family and safety net.

2

7.    Bishop Edwards also wanted to isolate his community from the outside
non-secular world, but for a different purpose, to wit: to create an empire of wealth using
the unpaid labor of people, including children, living under his total physical, financial,
psychological and spiritual control.

8.    The Holyland operated completely differently than how it portrayed itself
to the public. At the Holyland, children were raised communally and, in the case of the
Plaintiffs herein, were not with their parents. Upon information and belief, several
children at the Holyland were fathered by Bishop Edwards with different women.

9.    The Plaintiffs did not consent to nor were they aware of any legal
arrangement committing the Plaintiffs to these Defendants. They were not informed
whether they were sent to the Holyland as a foster home. They were not visited by
anyone from the Court or Child Services once they were in the custody of the
Defendants.

10.    They were cut off from communication with their mother, mail and gifts
from family members were confiscated and any contact with the outside world was
limited to supervised activities.

11.    Bishop Edwards, personally and through the elders overseeing the
Holyland, controlled arrangements for the Plaintiffs housing, education, health and
welfare, safety, nutrition, and every other facet of life. The Plaintiffs were subject to
torture, physical abuse, emotional abuse and sexual abuse and received severe discipline
from the church leaders and Bishop Edwards.

12.    Plaintiffs and other minor children of all ages at the compound were forced
to work without pay at the various business enterprises located in several different states
operated by Reach, Inc. and its affiliated entities.

13.    The children of the Holyland, including the Plaintiffs, worked at the
restaurants, motels, and other businesses operated by the Defendants. They did not
voluntarily donate their childhood or their labor to benefit Reach, Inc. and the other

3

Defendants. They were forced to perform these services without pay by coercion, including punishment, deprivation of food, threats, intimidation, and groupthink.

14.     Contrary to self-promoting claims that The Holyland is an outreach program and safe haven for troubled youths, these children, including the Plaintiffs, did not receive adequate health care or education. The private school, known then as the Christ Temple Academy was not accredited by the State of Alabama. Plaintiff R.J. "graduated" from the Christ Temple Academy, but later found that diploma to be worthless.

15.     The Plaintiffs did not share in the profits generated by their forced labor. There was no money put away for them or a share of the profits they created through their forced labor.

16.     Upon information and belief, under the spiritual authority of Bishop Edwards, children as young as 13 years old would be purportedly married, and incestuous relationships were promoted and protected. Sexual abuse of the minor children was commonplace including grooming female members to be the Bishop's concubines.

17.     A major source of income for the Defendants is using adults and children to solicit funds from strangers outside of big-box stores like Walmart and K-Mart under the all too ironic guise of raising money for abused children. The practice is called the "Route". They travel across the country for weeks to a month at a time to solicit funds, using the children as bait.

18.     The Defendants reaped millions of dollars using this scam. Bishop Edwards has admitted that all that cash went into the pockets of Reach, Inc., and not directly or specifically for abused children.

19.     Ironically, although if the stated intention of Bishop Edwards and Reach, Inc. is to provide a way out of poverty for its members, their methods run contrary to the law, and their practices have allowed, condoned, participated in, profited by, and nurtured labor and sex trafficking in violation of the law. It should be noted that other institutions

4

that have spirituality and charity as their focus have been held criminally and civilly liable for sexual abuse including the Catholic Church and the Boy Scouts.

20.     The Plaintiffs, due to the sensitive nature of the facts and that they suffered these acts while minors, and are now adults, wish to withhold their identities in all public filings and choose to be identified by their initials.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction pursuant to 28 U.S.C. §1331 and 1343 because this action arises under the Constitution and laws of the United States, including and pursuant to 18 U.S.C. §1595(a) because Plaintiffs assert a claim under 18 U.S.C. §1589. This court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over any Plaintiffs' related claims under state law.

22.     Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.

## PARTIES

23.     Plaintiff, S.M., is a resident of Duval County, Florida, over the age of majority and otherwise sui juris.

24.     Plaintiff, R. J., is the biological sister of Plaintiff S. M. She is a resident of Duval County, Florida, over the age of majority, and is otherwise sui juris.

25.     Defendant REACH, INC. is an Alabama non-profit corporation registered with the Secretary of State of Alabama with a principal place of business located at 35 Rainbow Lane, Catherine Alabama, 36728.

26.     Defendant The Dynasty Group, Inc. is an Alabama corporation registered with the Secretary of State of Alabama and has a principal place of business located at 308 Hyde Park Avenue, Eutaw, Alabama 35462

27.     Defendant ALABAMA-MISSISSIPPI FARM, INC., is an Alabama corporation registered with the Secretary of State of Alabama and has a principal place of business located at 5635 Sumter 20, Emelle, Alabama, 35459

28.     Defendant Luke Edwards a/k/a Bishop Luke Edwards is a resident of Eutaw, Greene County, Alabama, is over the age of majority and is otherwise sui juris.

29.     Defendants DOES 1-5 are those business entities owned, operated, controlled and managed by the other named Defendants, who participated in the labor trafficking of the Plaintiffs, shared in the benefits of the Plaintiff's forced labor, and financially benefitted through the labor trafficking of the Plaintiffs, whose identities are not known to the Plaintiffs at this time but will be added by amendment once ascertained.

30.     Defendants DOES 5-10 are those businesses or entities that knowingly benefits or conspires to benefit, financially or by receiving anything of value from participation in the ventures alleged against the other named Defendants.

## LEGAL STANDARDS

### Violation of the Trafficking Victims Protection Act (TVPRA), 18 U.S.C. §1589

30.     The TVPRA provides a private cause of action against anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform

such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. §1589(a).

31.    The TVPRA also provides a private cause of action against anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in [§1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means …." 18 U.S.C. §1589(b).

32.    Defendants knowingly obtained, provided, and financially benefited from the labor or services of Plaintiffs by means of force, threats of force, physical restraint, economic duress, and threats of physical restraint directed to those persons.

33.    Defendants knowingly obtained, provided, and financially benefited from the labor or services of Plaintiffs by means of the abuse or threatened abuse of law or legal process.

## STATEMENT OF FACTS

34.    The Plaintiffs were young children, born to a teenage mother suffering from alcoholism. and raised by their grandparents. Plaintiff R.J. is the older sister, she was born in 1973. She is about one year older than Plaintiff S.M. Eight people lived with the Plaintiff's grandparents in that house in Carthage, Mississippi.

35.    Plaintiffs' mother was abusive, physically and emotionally. At the time that Plaintiff R.J. was around 12 years old, and possibly in the seventh grade, a schoolteacher noticed bruises on the body of R.J. and reported the abuse to Children's Services.

36.    At that point, the Court determined that foster care was appropriate but instead, to a young R. J., it seemed that Plaintiff's mother decided to give R.J. away. R.J. recounts a long car ride with her mother and stepfather, from Carthage to Meridian, Mississippi, and a place called The Holyland.

7

37.     After the Children's Services investigation, Plaintiff S.M. began to live with cousins and had no contact with her sister, R.J. Soon thereafter, Plaintiff's mother regained custody of S.M., but as S.M. remembers, the Judge told her that S.M. would go to foster care, and recommended Reach.

38.     By that time, R.J. had been away for about a year and a half to two years, and S.M. was told by her mother that R.J. did not want to come back home. During the summer, Plaintiff's mother told S.M. that she was going to visit her sister for a few weeks. Instead, Plaintiffs' mother delivered her second child to the custody and control of Reach and the Holyland.

39.     Plaintiff R.J. was about 12 years old when she was delivered to the Holyland (about 1985) and into the control of Bishop Edwards. Upon her arrival, Plaintiff R.J. met with older women named Rose and Linda, as well as Bishop Edwards. That was the last time R.J. saw her mother until years later when she "graduated" from the Holyland school called Christ Temple Academy.

40.     Within a few hours of being delivered to Bishop Edwards, R.J. left Meridian Mississippi, and went to the Holyland camp at Emelle, Alabama. At the Holyland, R.J. met with "Sister Ola" who was the apparent head or manager of the camp.

41.     R.J. was shown her bed and for about the first month, she attended church and school at the Holyland in Emelle, Alabama. Without her knowledge, and although she was a minor, without her consent, she was being groomed by Bishop Edwards to learn the operation of this enterprise and to provide sexual services.

42.     Plaintiff R.J. was sent back to the Church in Meridian, Mississippi. She stayed with "Sister Rose" and Bishop Edwards. In lieu of regular school studies and the life of a minor, Plaintiff R.J. was forced to work in the Church office.

43.     Plaintiff R.J. was forced to sleep in the bed with an adult woman, "Sister Rose", who regularly sexually assaulted Plaintiff by touching her breasts and genitals.

8

44.     Daily life for Plaintiff R.J. at the Church in Meridian with "Sister Rose" and Bishop Edwards began by rising at 3 or 4 AM. Sister Rose would prepare Plaintiff R.J. to "serve" Bishop Edwards. She would bring Bishop Edwards his coffee or tea and kneel before him like he was a deity.

45.     Gradually, over time, Bishop Edwards began his sexual assaults on this minor child in his possession and control. He would expose his penis and have her touch it. He would touch her body. The Plaintiff became aware of where this was leading and began to do things to interrupt his sexual assaults. She would intentionally spill the coffee or tea, causing her to be punished by "Sister Ola" or Bishop Edward's wife. The plaintiff, a female child chose to suffer physical abuse, spankings, food deprivation and other torture to avoid the escalating sexual assaults of this all-powerful cult leader. She should not have had to make that choice.

46.     After those morning sessions with Bishop Edwards, Plaintiff R.J. would proceed to the various business enterprises owned and operated by these Defendants. They would visit the restaurants, and meat processing plants and go to Livingston, Alabama. She learned the operations of the various businesses and was taught to type and make bank deposits on Mondays and Thursday of money received from the panhandling scam they called "The Route".

47.     The primary source of funds for the expansion of Reach, Inc., enabling the acquisition of motels, restaurants, truck stops, herds of cattle, acres of land, meat processing plants and other assets, was called "The Route".

48.     Members of the Church, (and until receiving over 100 sanctions from the State of Alabama for underage labor, including minor-age children) would pile into vans and go to various big-box stores such as Walmart, Family Dollar, and K-Mart and put up tables to solicit cash donations from customers and passers-by.

49.     They would claim that the money was going to help abused children, which is perverse and ironic, considering that the money was going to the pockets of the

Defendants based upon the work and efforts of children and others forced by coercion, threats of force, actual force, intimidation, mind control and group think to participate in this scam on the public.

50.    Plaintiff R.J. participated in the "Route" and personally typed letters and established contact with those stores to obtain permission to solicit money in front of their stores. The participating stores, while on the surface supporting a charity, financially benefited from the goodwill and increased traffic that resulted from providing support to this enterprise.

51.    Plaintiff R. J. would deliver a letter to the store manager at the location that would describe and thank the store for participating in the fund-raising efforts. In addition, a banker's bag of money would be delivered to the store manager. Over time, Plaintiff delivered the letters and banker's bags of money to the same store and manager on multiple occasions.

52.    Plaintiff R.J. and the others on the Route knew which stores could be used as a front for their fundraising, and the big-box stores knew REACH was coming with a letter and a bag of cash.

53.    The people on the route would all wear similar clothing, usually blue and white. There would be between 7 and 13 people in each van, depending on the size of the van, and the Holyland operated between 7 and 15 vans. The printed hand-out materials would have pictures of children and the name of Defendant Reach, Inc.

54.    Plaintiff R.J. was trusted with counting the money and making the deposits. Plaintiff R.J. recalls that the Defendants, including Bishop Edwards, were very careful with the money used for the "Route", and the drivers had to account for every penny entrusted to them.

55.    The groups of people on the "Route" would be on the road for two weeks to a month at a time. When they returned and the money was counted, Plaintiff R.J. observed that each "Route" would bring back between one and three million dollars.

56.     Running away and escaping from the Holyland, as a minor, was dangerous. When you were brought back to the Holyland, you would be punished. You would be deprived of food, and physically beaten by "Brother Booker". Plaintiffs witnessed the results of those beatings, which intimidated the Plaintiffs and coerced all of the other children to refrain from trying to escape.

57.     Plaintiff R.J., now a teenager, knew that she was being groomed to be another concubine for Bishop Edwards. She was never left alone. Potential suitors were discouraged. She devised a plan to escape from the Holyland. She solicited the help of a truck driver that regularly came to the restaurant operated by Reach. She got into his truck one day and wanted to go home. Instead, he took her to his house and raped her.

58.     As so often happens when trafficked persons attempt and fail to escape from their traffickers, the only people she knew were the ones she was trying to escape from. Plaintiff R.J. called "Sister Rose" to come get her.

59.     Plaintiff R.J. was then subjected to additional punishment. R.J. was sent back to the Holyland from Meridian. She was forced to work in the kitchen but was deprived of food for one month. She survived on stolen food provided by other children.

60.     After the month of punishment at the hands of the Holyland, and after being raped, Plaintiff R.J. was forced to undergo a purported "sanctification" and "cleansing" that lasted for 3 days.

61.     Plaintiff R.J. was now approaching her 21st birthday. The Church was preparing a ceremony for the Plaintiff to be married to Bishop Edwards. Plaintiff R.J. ran away again.

62.     After spending several weeks at the Holyland, Plaintiff S.M. realized that school was about to begin and wanted to go home. She was to start the 9th grade and was about 15 years old. She had a meeting with "Sister Ola" and Defendant Bishop Edwards and requested that they call her mother. The Defendant denied her request and stated that

11

Plaintiff's mother wanted her to stay at the Holyland. Plaintiff S.M. did not want to remain at the Holyland.

63.     For a period of 4 to 6 weeks, Plaintiff S.M. did not eat a meal. Another girl would bring her a smuggled granola type candy bar every day. No adult took notice or intervened to protect the health of the Plaintiff, S.M.

64.     During the three years at the Holyland, Plaintiff S.M. only had two pair of shoes to wear. One was a hand-me-down and the other was purchased by a woman who later sued the Holyland, Reach and Bishop Edwards for sexual harassment and reportedly received $650,000.00.

65.     Plaintiff S.M. lived in fear of being beaten by Brother Booker as she had seen welts and bruises on other children who had been beaten.

66.     Plaintiff S.M., while a minor, was forced to work at the restaurants operated by the Defendants. She was required to work from  2 or 3 pm after school until 11 or 12 at night, six nights per week. At the age of 15, she was washing dishes at the Defendant's South Fork Restaurant in Eutaw, Alabama.  She also performed duties as a cook, and she bussed tables.

67.     After the Defendants were issued numerous child labor violations, the Defendants changed the policies only so that you had to be 16 years old to be forced to work at the restaurants, without pay.

69.     That resulted in children over 16, including Plaintiff S.M. (who were still minors) being forced to work longer hours.

68.     Plaintiff S.M. devised a plan to buy a bus ticket and go home to Carthage, Mississippi. She saved her tip money, which was against the Holyland's rules, and had about $70.00 saved. One day, when she returned after work, she discovered that her money was taken by Sister Ola.

70.    Plaintiff S.M., attempted to escape multiple times, only to be brought back and punished as described above. Finally, when she reached the age of 18, Plaintiff S.M. left for good.

71.    Plaintiff S.M. was forced to wake up early every Saturday morning to clean, wash and iron clothes and other chores.

72.    The members of the Holyland would eat donated food and keep it in an outside storage shed. Often, the food would be past the expiration date. On one occasion, Sister Helen prepared a beef stroganoff meal that was tainted. Everyone in the compound became very ill, including Plaintiff S. M. She was denied any medical care or treatment.

73.    Although Plaintiffs S.M. and R.J. are siblings, they were kept apart. They were allowed to talk to their mother only about 2 times per year and only over monitored telephone calls. Their aunt sent letters that were confiscated and sent money that never was received by either Plaintiff.

74.    Plaintiffs lived in fear of being punished. They were forced to work, or would not be fed. They were not allowed to leave the compound. They had no independence. They had no freedom. They were slaves being held against their will and forced to work for masters that physically, emotionally, and in the case of R.J., sexually abused them for years.

## COUNT 1

## R.J. against all Defendants for violations of Federal Law , 18 USC  1589 and 1595

75.    Plaintiff R.J. realleges and reavers the allegations in paragraphs 1-61, 73-74, as if fully set out herein.

76.    The Defendants are guilty of willful violations of Federal Law codified as 18 U.S.C. 1589, which states:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

> **(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> **(2)** by means of <u>serious harm</u> or threats of <u>serious harm</u> to that person or another person;
> **(3)** by means of the <u>abuse or threatened abuse of law or legal process</u>; or
> **(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer <u>serious harm</u> or physical restraint, shall be punished as provided under subsection (d).

77.    Plaintiff R.J. makes these civil claims against the Defendants pursuant to Federal law codified as 18 U.S.C. Section 1595 (a).

> (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

78.    As set out in detail above, Plaintiff R. J. as a minor, and also against her will, provided labor and services, without compensation, through the use of threats of serious harm, physical restraint and by means of a scheme and plan that caused the Plaintiff to believe that if they did not perform such labor or services, the Plaintiff would suffer serious harm and abuse.

79.    The Defendants, jointly and severally, knowingly benefitted financially by participating in the venture which engaged in violation of 18 U.S.C. 1589, as described herein, because the Defendants, as participants in the scheme and plan, knew or should have known violated 18 U.S.C. 1589.

WHEREFORE, Plaintiff RJ demands judgment against all Defendants, jointly and severally, for personal injuries, mental anguish, past and future medical and emotional treatment and therapy, compensatory and punitive damages, attorney's fees and costs and for all other relief as is just under the premises.

14

## **COUNT 2**

### **S.M. against all Defendants for violations of Federal Law, 18 U.S.C. 1589 and 1595.**

80.    Plaintiff S.M. realleges and reavers the allegations in paragraph 1-38, 56, and 62-74, as if fully set out herein.

81.    The Defendants are guilty of willful violations of Federal Law codified as 18 U.S.C. 1589, which states:

> **(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
>> **(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>> **(2)** by means of <u>serious harm</u> or threats of <u>serious harm</u> to that person or another person;
>> **(3)** by means of the <u>abuse or threatened abuse of law or legal process</u>; or
>> **(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer <u>serious harm</u> or physical restraint, shall be punished as provided under subsection (d).

82.    Plaintiff S.M. makes these civil claims against the Defendants pursuant to Federal law codified as 18 U.S.C. Section 1595 (a).

> **(b)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

83.   As set out in detail above, Plaintiff S.M. as a minor, and also against her will, provided labor and services, without compensation, through the use of threats of serious harm, physical restraint and by means of a scheme and plan that caused the Plaintiff to believe that if they did not perform such labor or services, the Plaintiff would suffer serious harm and abuse.

84.   The Defendants, jointly and severally, knowingly benefitted financially by participating in the venture which engaged in violation of 18 U.S.C. 1589, as described herein, because the Defendants, as participants in the scheme and plan, knew or should have known violated 18 U.S.C. 1589.

WHEREFORE, Plaintiff S.M. demands judgment against all Defendants, jointly and severally, for personal injuries, mental anguish, past and future medical and emotional treatment and therapy, compensatory and punitive damages, attorney's fees and costs and for all other relief as is just under the premises.

## PLAINTIFFS HEREBY DEMAND A TRIAL BY STRUCK JURY FOR ALL COUNTS

16

Travis R. Walker, Esq (pro hac vice to be
filed)
1100 SE Federal Highway
Stuart, FL 34994
(772) 708-0952
travis@traviswalkerlaw.com
service@traviswalkerlaw.com

COUNSEL FOR THE PLAINTIFFS